UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BORIS LEWIS,

        Plaintiff,

                                    Case No. 07-CV-13825
vs.                                HON. GEORGE CARAM STEEH

CAPT. KEVIN STELLINGWORTH, et al.,

        Defendants.

_____/

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#19)

        Defendants Captain Kevin Stellingworth, Lieutenant Cliff Soles, Deputy Eric Baker, Deputy Kyle Montgomery, Deputy David Elwell, Deputy Phillip Watson, Sergeant Bob Vogt, and Jackson County move for summary judgment of plaintiff Boris Lewis' federal 42 U.S.C. § 1983 claims of excessive use of force, illegal search and seizure, municipal liability, and claim of assault and battery.  The parties agreed to waive oral argument.  For the reasons set forth below, the defendants' motion for summary judgment will be GRANTED.

## I. Record Evidence

        Plaintiff Boris Lewis was held in contempt of court by Jackson County Circuit Court Judge John McBain on September 29, 2004 for refusing to submit to a DNA paternity test. Lewis appeared before Judge McBain pro per on the Jackson County Friend of the Court's ("FOC") motion to compel the paternity test.[1]  Lewis told Judge McBain he was not involved with the pregnant woman.  When Judge McBain explained that the simple test would

---

[1]    An audio-video recording of the hearing is included as part of the record.

conclusively establish whether or not Lewis was the father, Lewis responded that "the time is not right" to take the test because he has been told not to put anything into his body. Judge McBain advised Lewis that the DNA test simply involved placing a cotton swab into his mouth.  Lewis responded with concerns about "contamination."  Judge McBain rejected a written explanation proffered by Lewis, that the State of Michigan was going to kill Lewis, and explained again that the test involved placing a cotton swab into his mouth for approximately two seconds, a procedure less invasive than using a toothbrush.  Lewis again protested that the "time was not right," and that he had been told by a FOC staffer that he was already considered the child's father.  Judge McBain warned Lewis that he would be held in contempt of court and placed in jail if he did not submit to the DNA test.  Lewis refused the testing, was found in contempt of court, and was ordered handcuffed and held in the Jackson County Jail until he complied with the court's order to submit to testing. Lewis became agitated, and expressed a knowledge of his constitutional rights.  Judge McBain informed Lewis of his right to file an interlocutory appeal, and reiterated the simplicity of the DNA test.  Lewis repeated his concern about contamination.  A court officer handcuffed Lewis with his arms in front of his body.  Two uniformed deputies then escorted Lewis from the courtroom to a "tunnel-area" to await transport to the adjacent County Jail. The tunnel-area consisted of a small room separated on two sides by locked doors.  Lewis was locked in this holding room by himself.

    Defendants Deputy Baker and Deputy Montgomery of the Jackson County Sheriff's Department were dispatched to the tunnel-area holding room to escort Lewis to jail. According to Baker and Montgomery, Lewis became irate when he was instructed to leave the holding room and walk to an elevator, and instead passively planted his feet, situated

2

his body-weight against a wall, and refused to move.  Lewis was 32 years-old at the time, and described himself as 5' 8" tall, and weighing 225 pounds.  Deputies Baker and Montgomery attest they used an "under-arm carry" to move Lewis to the elevator. Defendant Deputy Elwell later arrived to assist.  According to Deputy Baker, Lewis began actively resisting once they entered the elevator.  Baker attests that Lewis tried to break free, prompting Deputy Elwell to spray Lewis with a chemical irritant.  Deputy Elwell later reported that Lewis had attempted to assault both the officers.  Deputy Baker testified that the chemical irritant had little to no effect on Lewis.

According to Lewis, an unidentified Jackson County Deputy Sheriff approached him inside the tunnel-area holding room and said "C'mon."  Lewis attests that the Deputy grabbed and pulled the handcuff chain "real hard."  Lewis testified he told the Deputy "[y]ou don't have to pull hard," "I'm coming," and "I'm not resisting or nothing."  Lewis stated that he was "really being considerate and . . . was doing whatever they want[ed] me to do[.]" Lewis testified that "all of a sudden" he was maced from behind by a second unidentified deputy.  Lewis maintains that, from that point on, he was blinded by the chemical irritant. Lewis stated that, while he was gagging from the effects of the chemical irritant, and as he brought his hands up to his face to wipe away the mace, one of the deputies placed him in a "full-nelson" headlock and pushed him down to his knees.  Lewis stated he was kept in the headlock while being pushed and pulled down a hallway towards an elevator.  Lewis testified that he was eventually pushed onto the elevator floor, with the headlock used to apply pressure to his neck.  Lewis testified that, after a "really quick" elevator ride, he was released from the headlock and shoved into a second holding cell by himself.

Defendants Lieutenant Soles, Sergeant Vogt, and Deputy Watson were waiting

outside the elevator to assist Baker and Elwell.  Lieutenant Soles and Sergeant Vogt used an "under-arm carry" to escort Lewis into the holding cell, after which Sergeant Vogt left the area.  Lewis initially testified that he did not recall whether he was dragging his feet or walking, but later stated he didn't put his feet on the ground and walk with the Deputies because "I couldn't see and my face was on fire."  According to Deputy Baker and Lieutenant Soles, Lewis was screaming during this time that he was going to kill himself.  Lieutenant Soles testified that a Dr. Balunas of the Jackson County Department of Mental Health was called to the area.  Dr. Balunas reported that Lewis appeared "agitated, non-cooperative and saying that he was going to kill himself."  Based on these observations, Lewis was placed on suicide watch.  Lewis, in contrast, denies even suggesting to anyone that he wanted to harm or kill himself.

Lewis testified that his handcuffs were removed once he was inside the holding cell.  According to Lewis, Lieutenant Soles introduced himself and ordered Lewis to "strip naked."  Soles told Lewis he would be given a paper gown.  Lewis stated that, when he refused to comply with Soles' order to strip, "that's when I got beat up and jumped."  Lewis testified that he felt "a whole bunch of hands" on him, hands which picked him up, removed his clothing, and "slammed" him to the ground where he landed on his neck and left shoulder.  Lewis testified that a racial slur and other insulting comments were made.  Lewis denied receiving a smock or any other type clothing after he was stripped, testifying that unknown people whom he believed to be jail staff whistled at him and made sexual comments about his naked body.  Soles attests that he removed Lewis' clothing with the assistance of Baker and Elwell.  Deputy Watson observed.  Deputies Baker and Watson testified that Lewis actively resisted the removal of his clothing as part of the suicide watch.  Lieutenant Soles testified

4

that, after Lewis' clothes were removed, he sat Lewis down on a cell bench and left him wearing a suicide smock.  Lewis testified he was alone in the cell.

Lewis attests that his repeated requests for medical attention for his ribs, left shoulder, head, and eyes were ignored, and that his requests to see his own psychological therapist, Linda Nelson, were denied.  Lewis testified that he refused to talk to Dr. Balunas because he could not see him due to the effects of the mace, and he did not believe Dr. Balunas was a medical doctor.  Lewis admitted that Lieutenant Soles later gave him "Sudican" wipes and a wet towel to wipe the chemical irritant from his eyes.

Lieutenant Soles testified that, fifteen minutes after removing Lewis' clothing, he returned to Lewis' cell and attempted to explain that the DNA test simply required a swab of Lewis' saliva.  Lewis testified he was told by Soles that he could leave if he took the DNA test.  Lewis refused the test, stating he wanted his own independent testing.  Lewis gave Soles the impression that he "thought that I was going to poison him or something like that." Soles testified that, when he returned to the cell again five minutes later, Lewis was calmer and agreed to submit to the DNA test.  According to Soles, he assisted Lewis in dressing and then administered the test.

Lewis testified that Lieutenant Soles returned to the holding cell, helped him get dressed, and sat him down outside the cell.  According to Lewis, after someone took his picture, he felt fingers go into his mouth and something rubbing against his gums.  Lewis testified that a deputy stated "Well, we got what we wanted, he can leave now.  We got our DNA test."  Lewis denied agreeing to submit to the DNA test.

Soles testified that Judge McBain called him at the holding area, and sent a test kit over after being told that Lewis had calmed down and agreed to take the test.  Dr. Balunas

5

reported later observing a calmer Lewis, who was now denying any suicidal intentions. Child Support Caseworker Eva Carroll states in her report that she was called by the jail and informed that Lewis had decided to take the DNA test. Carroll brought the DNA test kit to the jail where Lieutenant Soles brought Lewis out of the cell and administered the test. According to Carroll's report, after Soles completed the swabbing, Lewis "started saying things about this test giving him AIDS and killing him." Carroll also observed that Lewis had an ice pack on his eye. Defendant Captain Kevin Stellingworth testified that he only became aware of Lewis' presence at the jail after hearing Lewis shouting and screaming at deputies as they escorted him out of the Jail.

Lewis testified that, after being released from jail, he was taken to the Foote Express Care walk-in clinic by his mother. Lewis attest that he had red circles around his eyes, and that the chemical irritant "ate the skin . . . off." According to Lewis, a doctor placed milk on his eyes, which stopped the burning. Lewis did not seek any other treatment that day. A few days later, Lewis went to the Center For Family Health, where he was given a sling for his left shoulder pain. A later MRI revealed "tendinitis." Lewis admitted he had been treated for left shoulder pain at Foote Hospital earlier in March 2003. Lewis did not suffer any objective injuries to his ribs, head, or left wrist.

## II. Standard of Review

Defendants move for summary judgment of each of Lewis' claims. Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Redding v. St. Eward, 241 F.3d

530, 532 (6th Cir. 2001).  The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by the use of materials specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800.

### III. Assault and Battery

Count I alleges assault and battery.  Defendants argue they are entitled to summary judgment of this state law claim pursuant to a two-year statute of limitations defense and state law governmental immunity.  Lewis responds that Count I alleges a federal assault and battery claim under § 1983 which is subject to a general three-year statute of limitations, and that the federal claim is unaffected by state tort immunity.

Lewis' assault and battery claim as alleged in Count I does not allege a federal §

7

1983 claim for the violation of a constitutional right.  While Counts II through IV expressly invoke 42 U.S.C. § 1983 and allege violations of Lewis' Fourth and Fourteenth Amendment rights, <u>see</u> Complaint, ¶¶ 25-26, 29-30, 35-36, at 5-7, Count I simply alleges that "Defendants' actions – spraying Plaintiff with mace, then physically grabbing Plaintiff and throwing him to the ground – constituted assault and battery where there was no legal basis for such conduct and where said Defendants acted with malice or ill will."  Complaint, ¶ 22, at 4.  This state law claim is barred by the two-year statute of limitations of M.C.L. § 600.5805(2) governing an "action charging assault, battery, or false imprisonment" in that Lewis was allegedly assaulted on September 29, 2004, and this lawsuit was filed nearly three years later on September 11, 2007.  Even to the extent Count I could be construed as alleging a federal claim of assault and battery, the claim would be subject to dismissal as duplicative of Count II alleging a federal excessive force claim.  <u>Raymond v. Bunch</u>, 136 F.Supp.2d 71, 81 (N.D.N.Y. 2001); <u>Allmond v. Alexandria Sheriff's Dept.</u>, No. Civ.A. 02-309-A, 2002 WL 32514956, *3, *3 n.7 (E.D. Va. June 4, 2002).  Defendants are entitled to summary judgment of Lewis' assault and battery claim as alleged in Count I, whether construed as a state law claim barred by a two-year statute of limitations, or as a federal claim duplicative of the excessive force claim alleged in Count II.  <u>Amway Distributors</u>, 323 F.3d at 390.

## IV. Federal Claims

In Counts II and III respectively, Lewis alleges federal § 1983 claims of excessive force and unreasonable search and seizure under the Fourth and Fourteenth Amendments against Captain Stellingworth, Lieutenant Soles, Deputy Baker, Deputy Montgomery, Deputy Elwell, Deputy Watson, and Sergeant Vogt in both their individual and official capacities.

Count IV alleges municipal liability against Jackson County for violations of Lewis' constitutional rights.

## A.  Excessive Force

### i.

Lewis argues his excessive force claim is subject to a Fourteenth Amendment due process analysis because he was a pretrial detainee.   Defendants also advocate a Fourteenth Amendment analysis under a theory that Lewis was placed in the custody of the defendant Jackson County Deputies only after he was first seized and arrested by Judge McBain's court officer.   Nonetheless, both Lewis and the defendants rely on the Eighth Amendment standard of review articulated in Caldwell v. Moore, 968 F.2d 595 (6th Cir. 1992): whether the alleged "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   Id. at 600 (quoting Hudson v. McMillian, 112 S.Ct. 995, 999 (1992)).

In examining excessive force claims, a court must first identity the specific constitutional right allegedly infringed.   Phelps v. Coy, 286 F.3d 295, 299 (6th Cir. 2002) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)).   The question "is not merely academic, for the standards vary significantly according to which amendment applies."   Id. (quoting Darrah v. City of Oak Park, 255 F.3d 301, 306 (6th Cir. 2001)).   "Which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between."   Id. (citing Gravely v. Madden, 142 F.3d 345, 348-49 (6th Cir. 1998)).   If the plaintiff was a free citizen and the use of force occurred during an arrest or other seizure, the excessive force claim arises under the Fourth Amendment and its standard of objective reasonableness.   Id.   If the plaintiff was a

9

convicted prisoner at the time the force was used, the Eighth Amendment standard applies, a standard that asks "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).  If the plaintiff was neither a free citizen nor a convicted prisoner when the challenged force was applied, such as a pretrial detainee, then the more general due process clause of the Fourteenth Amendment applies. Id. at 300 (citing Darrah, 255 F.3d at 305-06).  The Fourteenth Amendment protects citizens from the arbitrary use of governmental power, and asks whether the alleged conduct "shocks the conscious" under the totality of the circumstances of the case. Darrah, 255 F.3d at 306.

Lewis was not a free citizen after Judge McBain found him in contempt of court and ordered him held in custody at the Jackson County Jail until he submitted to the DNA test. See Sharp v. Kelsey, 918 F.Supp. 1115, 1122 (W.D. Mich. 1996) (applying Eighth Amendment standard to claim that excessive force was used by deputies transferring attorney to jail after she was found in criminal contempt for her courtroom conduct).  The Fourth Amendment does not apply. Id.  Lewis was not a suspect or "pretrial detainee" awaiting an adjudication of charges. Id.

> . . . .  When exercising its civil contempt power [to coerce compliance with a court order], the court acts as the factfinder, determines whether there was contempt under a preponderance of the evidence standard, and imposes sanctions if this standard is met.  If the contemptuous behavior occurs in front of the court, i.e., it is "direct" contempt, there is no need for a separate hearing before the court imposes any proper sanctions because all facts necessary to a finding of contempt are within the personal knowledge of the judge.  . . . .

In re Contempt of Auto Club Ins. Association, 243 Mich. App. 697, 712, 624 N.W.2d 443 (2001) (footnotes and internal quotations omitted).  Judge McBain found Lewis in "direct" civil contempt, and ordered Lewis jailed to coerce compliance with the court's order to take

the DNA test. See id. at 712, 712 n.15. Because Lewis was a prisoner in the custody of the

Jackson County Sheriff's Department pursuant to Judge McBain's contempt sanction, "any

treatment [Lewis] received on the way to a jail cell is governed by the Eighth Amendment."

Sharp, 918 F.Supp. at 1122.[2]  See also Richman v. Sheahan, No. 98 C 7350, 2007 WL

489138, *5-*6 (N.D. Ill. Feb. 2, 2007) (holding that criminal contemnor was a prisoner when

alleged excessive force was applied, and therefore Eighth Amendment standard applied),

aff'd in part, 512 F.3d 876, 883 (7th Cir. 2008).  The Eighth Amendment applies to Lewis'

excessive force claims.

### ii.

Although erroneously identifying the Fourteenth Amendment as controlling, the

parties relied on the applicable Eighth Amendment standard in their briefs: whether the

alleged "force was applied in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm." Caldwell, 968 F.2d at 600 (quoting Hudson, 112

S.Ct. at 999).

> [T]he inquiry in all cases where prisoners allege the excessive use of force
> is whether the force was applied 'maliciously for the purpose of causing harm."
> Hayes v. Marshall, 887 F.2d 700, 703 (6th Cir. 1989).  To determine such
> motivations on the part of correctional officers, courts should consider the
> reasons or motivations for the conduct, the type and extent of force applied,
> and the extent of inflicted injury. See Whitley [v. Albers, 475 U.S. 312, 320-22
> (1986)].

Caldwell, 968 F.2d at 600.

---

[2]  The distinction between civil contempt and criminal contempt in the context of
deciding the appropriate constitutional standard to be applied to Lewis' excessive force
claim is inconsequential.   "[A]ll contempts may be said to be criminal in nature because
they permit imprisoning a contemnor for wilfully failing to comply with an order of the court.
Hence, legal authors and courts have stated that all contempts are 'quasi-criminal' or
criminal in nature." In re Contempt of Dougherty, 429 Mich 81, 90, 413 N.W.2d 392 (1987)
(internal citation omitted).

Under the <u>Whitley</u> approach, the extent of injury suffered by an inmate is one factor that may suggest "whether the use of force could plausibly have been thought necessary" in a particular situation, "or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  457 U.S., at 321, 106 S.Ct., at 1085. In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response."  <u>Ibid</u>.  The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

<u>Hudson</u>, 503 U.S. at 7.

The Sixth Circuit has recognized:

When an order is given to an inmate there are only so many choices available to the corrections officer.  If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.   While experts who testified on behalf of the plaintiffs suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

<u>Caldwell</u>, 968 F.2d at 602 (quoting <u>Soto v. Dickey</u>, 744 F.2d 1260, 1267 (1984)).  The use of pepper spray or mace, like the use of any other force, does not violate the Eighth Amendment if it was applied in good faith to restore or maintain discipline.  <u>See</u> <u>Caldwell</u>, 968 F.2d at 600 (setting forth case authority that supports the use of mace and chemical agents to maintain prison discipline); <u>Soto</u>, 744 F.2d at 1270 (setting forth case authority that supports the use of mace and chemical agents to prevent riots or escape or to subdue recalcitrant prisoners even if the inmate is locked in his prison cell or is in handcuffs); <u>Davis v. Agosto</u>, 89 Fed.Appx. 523, 526 (6th Cir. 2004) (holding that officers "did not act maliciously or sadistically in using mace" to secure compliance when prisoner in jail cell refused to place his hands in a tray slot to be handcuffed).

**iii.**

At the outset, it is beyond reasonable dispute that Lewis did not suffer a serious injury at the hands of the defendants on September 29, 2004. Lewis was given "Sudican" wipes, a wet towel, and ice to apply to his eyes shortly after he was sprayed with a chemical irritant. The burning sensation Lewis experienced completely resolved after a doctor applied "milk" to the irritated red skin around his eyes. The tendinitis diagnosed in Lewis' left shoulder is neither a serious injury nor causally linked to the force applied by the defendants. There is no objective evidence in the record that Lewis suffered a serious injury to his ribs, left shoulder, left wrist, head, or eyes.[3] This absence of injury supports the inference that the force used against Lewis was plausibly thought by the individual defendants to be necessary in the particular situations they each encountered. Caldwell, 968 F.2d at 600; Hudson, 503 U.S. at 7.

There is also no reasonable dispute that escalating force was properly applied by the Deputies for the legitimate purposes of compelling compliance with their orders, restoring and maintaining Jail discipline, and subduing the recalcitrant Lewis. Caldwell, 968 F.2d at 600, 602. Notwithstanding his protests of "cooperation," Lewis agrees that Deputies Baker and Montgomery were required to employ an "under-arm carry" to transport him from the tunnel-area holding cell to the elevator because the 225-pound Lewis passively refused to move. The struggle to carry Lewis into the elevator while he physically and verbally resisted the Deputies allowed Deputy Elwell to plausibly believe he needed to apply pepper spray

---

[3] Lewis cannot maintain an Eighth Amendment claim that the defendants were deliberately indifferent to his requested need for medical treatment in the absence of objection proof that he was suffering from a sufficiently serious medical need for treatment. Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004).

to gain Lewis' compliance and restore order.  Hudson, 503 U.S. at 7; Caldwell, 968 F.2d at 600, 602; Soto, 744 F.2d at 1270; Davis, 89 Fed.Appx. at 526.  When the pepper spray failed to subdue Lewis, and as Lewis struggled to lift his handcuffed wrists towards his face, the Deputies could plausibly believe that placing Lewis in a "full-nelson" headlock was necessary to safely transport Lewis on the elevator.  Id.  After the "really quick" elevator ride, Lewis admittedly continued to disobey the Deputies by refusing to put his feet down and walk to the holding cell, requiring Lieutenant Soles and Sergeant Vogt to again employ an "under-arm carry" to transport Lewis.  Id.  Once secure in the holding cell, Lewis' handcuffs were removed.

        Lewis' denial that he even suggested to anyone that he wanted to harm himself is somewhat belied by his admitted demand to see his own psychological therapist, Linda Nelson[4].  Lewis admits that he was observed by a Dr. Balunas.  The Deputies could plausibly rely on Dr. Balunas' assessment that Lewis should be placed on suicide watch for his own safety, and have his clothing removed, before being left alone in a holding cell.  Hudson, 503 U.S. at 7.  It is undisputed that Lewis refused Lieutenant Soles' order to strip before force was applied.  It was reasonable for Lieutenant Soles, Deputy Baker, and Deputy Elwell  to believe it was necessary to bring the recalcitrant Lewis to the ground to remove his clothing.  Id.  Lewis' testimony that unidentified individuals he believed to be jail staff used a racial slur, whistled, and made other insulting comments fails to dispute the Deputies' plausible belief that force was needed to disrobe Lewis for his own safety.  Id.  It is undisputed that, once Lewis was disrobed, he was left alone in his cell for fifteen minutes

---

        [4]  Lewis testified that he believed on September 29, 2004 that Jackson County Health Department Officials would attempt to poison or harm him in some way if he submitted to the DNA test that day.

to calm down, and that Soles returned in an effort to persuade Lewis that no one was trying
to poison him.

Construing the pleadings and evidence in a light most favorable to plaintiff Lewis,
Lewis has failed to come forward with sufficient evidence to reasonably dispute that
Lieutenant Soles, Deputy Baker, Deputy Montgomery, Deputy Elwell, Deputy Watson, and
Sergeant Vogt each applied force to Lewis in a good-faith effort to maintain or restore
discipline, and not for the purpose of maliciously or sadistically causing harm. Caldwell, 968
F.2d at 600; Amway Distributors, 323 F.3d at 390; First Nat'l Bank, 391 U.S. at 270;
McLean, 224 F.3d at 800. It follows that Captain Stellingworth cannot be found liable under
a theory of supervisory liability in the absence of proof that he authorized, approved, or
knowingly acquiesced in any unconstitutional application of force by his subordinates. See
Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984). Alternatively, to the extent the force
applied by the defendants could possibly be construed as a violation of a clearly established
Eighth Amendment right, the defendants are entitled to qualified immunity because it would
not have been clear to any of them that their conduct was unlawful under the circumstances.
Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001). Defendants are entitled to summary
judgment of Lewis' excessive force claim as alleged in Count II as a matter of law. Amway
Distributors, 323 F.3d at 390.

## B.  Unreasonable Search and Seizure

Count III alleges that each of the defendants illegally searched and seized Lewis by
taking his DNA sample. On this record, the individual defendants are entitled to absolute
quasi-judicial immunity for searching and seizing Lewis pursuant to Judge McBain's court
order. See Bush v. Rauch, 38 F.3d 842, 847 (6th Cir. 1994) (recognizing that non-judicial

15

officers enforcing or executing court orders are entitled to absolute immunity).  Lewis' argument that Lieutenant Soles acted outside Judge McBain's order by taking the DNA sample without Lewis' consent is not well taken.  It is undisputed that Soles returned Lewis' clothing to him believing that Lewis had consented to the DNA test.  Soles told Judge McBain that Lewis had consented to the test, prompting Judge McBain to send a test kit over to the jail.  Lewis does not dispute that he was calm when Soles assisted him in getting dressed and lead him outside of the holding cell.  Under these circumstances, Soles is, at minimum, entitled to qualified immunity because, under the circumstances, it would not have been clear to Lieutenant Soles that Lewis had not consented to the swabbing, and that he was not acting under the authority of Judge McBain's order.  Klein, 275 F.3d at 550.  Defendants are entitled to summary judgment of Lewis' unreasonable search and seizure claim as alleged in Count III as a matter of law.  Amway Distributors, 323 F.3d at 390.

## C. Municipal Liability of Jackson County

Lewis has failed to proffer evidence that a Jackson County policy, custom, or practice was a direct result of the alleged constitutional violations.  Cummings v. City of Akron, 418 F.3d 676, 684 (6th Cir. 2005).  Nor has Lewis proffered evidence of a history of constitutional violations that lead to the individual defendants' deliberate indifference to his constitutional rights.  St. John v. Hickey, 411 F.3d 762, 775 (6th Cir. 2005).  Captain Stellingworth's investigation of Lewis' civilian complaint does not establish a prior history of deliberate indifference.  Defendant Jackson County is entitled to summary judgment of Lewis' municipal liability claim as alleged in Count IV as a matter of law.  Amway Distributors, 323 F.3d at 390.

## V. Conclusion

16

Defendants' motion for summary judgment is hereby GRANTED.  Lewis' claims are hereby DISMISSED with prejudice in their entirety.

SO ORDERED.

Dated:  May 14, 2009

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

| CERTIFICATE OF SERVICE |
| --- |
| Copies of this Order were served upon attorneys of record on May 14, 2009, by electronic and/or ordinary mail. |
| s/Josephine Chaffee<br>Deputy Clerk |